# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| Board of Trustees of the Painters and Floorcoverers Joint Committee, et al., | Case No.: 2:19-cv-00252-JAD-VCF |
| Plaintiffs | **Order Granting in Part Plaintiffs' Motion for Summary Judgment and Denying Defendant's Cross-Motion and Motion for Summary Judgment** |
| v. | |
| Olympus and Associates, Inc., et al., | [ECF Nos. 30, 31, 39] |
| Defendants | |

A group of employee-benefit plans sued Olympus and Associates, Inc. and its executive officers, George and Lazarus Tsiopos, for breach of contract and violating the Employee Retirement Income Security Act (ERISA) when they failed to make trust-fund contributions under the terms of a collective-labor agreement formed with a union. Both parties move for summary judgment,[1] focusing on whether Olympus was bound by the agreement, Olympus properly terminated the agreement, and George and Lazarus can be held personally liable under the agreement, and whether the plaintiff trusts have properly demonstrated their alleged damages.

Based on undisputed facts, I find that Olympus was bound by the parties' initial labor agreement and failed to properly terminate it, and that the plaintiff trusts are owed monetary damages. But questions of fact preclude me from resolving (1) whether the plaintiff trusts are equitably estopped from enforcing the agreement, given certain alleged promises made to Olympus by a union representative; and (2) the amount of delinquent contributions that the

---

[1] ECF Nos. 30 (plaintiffs' motion for summary judgment); 31 (defendants' motion for summary judgment); 39 (defendants' cross-motion for summary judgment).

plaintiff trusts are owed.  So I grant the plaintiffs' motion for summary judgment in part and deny Olympus's motion and cross-motion for summary judgment.

**Background**

## I.   Olympus's relationship with the International Union of Painters and Allied Trades

Olympus is a Nevada-based contracting company—owned by father-and-son team George and Lazarus Tsiopos, alongside Lazarus's wife, office manager Lyndsey Tsiopos[2]—that operates throughout Nevada and California.[3]  Beginning in May 2010, Lazarus and Lyndsey, on behalf of the company, signed separate labor agreements with District Council No. 16 and Local Union No. 159 of District Council No. 15, each of which is a local chapter of the International Union of Painters and Allied Trades, so that Olympus could hire union employees.[4]   The agreement with District 16, colloquially known as the Northern Nevada Labor Agreement, authorized union painting and decorating work in northern Nevada and parts of California.[5]  The agreement with Local Union 159 of District 15, known as the Southern Nevada Labor Agreement, permitted union employees to work throughout Nevada's southern counties.[6]  These agreements were revised over time, sometimes requiring involved parties to sign addenda, memoranda of understanding, and successor agreements, which variously renewed the parties'

---

[2] Unlike George and Lazarus, Lyndsey does not have a stake in the company.  *See* ECF No. 30-4 at 5.

[3] ECF Nos. 3-1; 30-4 at 5.

[4] ECF Nos. 30-2; 30-4 at 18; 30-8 at 33 (Painters Master Agreement with District Council No. 16 ("Northern Nevada Master Agreement")); ECF No. 30-14 at 47 (Painters & Decorators Master Agreement with Local Union No. 159, District Council No. 15 ("Southern Nevada Painters Master Agreement")); 37-1 at ¶ 38.

[5] ECF No. 30-8 at 2.

[6] ECF No. 30-14 at 8.

obligations and adjusted the agreements' terms.[7]  Throughout each agreement's tenure, Olympus was required to report its employees' hours of covered labor and contribute funds to third-party beneficiary trusts, called Taft-Harley employee-benefit plans, which in turn dispersed those funds to union affiliates as health, pension, and fringe benefits.[8]

## II.     Southern Nevada Master Agreement

Lyndsey, on behalf of Olympus, signed the Southern Nevada Labor Agreement with Local Union 159 of District 15 on January 31, 2011.[9]  Under the plain terms of the agreement, the signatory parties include Local Union 159, "which is affiliated" with District 15; "signatory contractors associations," including the Southern Nevada Chapter of the PDCA, the WWCCA, and any of those associations' "present and future signatory members;" "firms who have executed written authorization for the Chapter to represent them;" and "any independent employers who may affix their signature[s] to this agreement."[10]  The Southern Nevada Labor Agreement contained the following relevant clauses:

> Commencing with [7/1/2007] and for the duration of this Agreement and any renewals or extensions thereof, the

---

[7]  Addenda to the Northern Nevada Labor Agreement with District 16 were signed in May 2010 by Lazarus, ECF Nos. 30-9 at 3; 30-4 at 17–18, and in February 2011, August 2012, and December 2012 by Lyndsey, ECF Nos. 30-10 at 3, 30-11 at 3, 30-12 at 2.  In 2016, George signed a superseding agreement with District 16.  ECF No. 30-13 at 33.  For the Southern Nevada Labor Agreement, the plaintiffs provide memoranda of understanding, revising terms in the Southern Nevada Labor Agreement and memorializing changes in wage rates, signed by District 15 and various union representatives.  *See, e.g.*, ECF Nos. 30-18–30-20.  Plaintiffs also provide a successor agreement to the Southern Nevada Labor Agreement devoid of Olympus's signature.  *See* ECF No. 30-21.

[8] ECF No. 30-7 at 13.

[9] ECF No. 30-14 at 47; ECF No. 37-3 at ¶¶ 6–8.  When shown this agreement at her deposition, Lyndsey testified that she understood it to be an agreement between "Olympus and District Council 15" and admitted that it contained her signature.  *See* ECF No. 30-4 at 17–18.

[10] ECF No. 30-14 at 4.

> Employer[11] . . . agrees to make payment to the IUPAT Union and
> Industry Pension Fund for each employee covered by this
> Agreement [and] to the Painters Joint Apprenticeship and Training
> Committee for each employee covered by this Agreement . . . .
>
> This Agreement shall be in full force and effect from 7/1/2007 to
> and including 6/30/2011 and shall continue from year to year
> thereafter unless written notice of desire to cancel or terminate the
> Agreement is served by either party upon the other not less than
> sixty (60) and not more than ninety (90) days prior to 6/30/2007 or
> June 30 of any subsequent contract year . . . .
>
> The Employer hereby agrees to be bound by and to [the pension
> fund agreements], as amended from time to time, as though he
> actually signed the same.[12]

The plaintiffs claim that the parties amended this agreement in two ways. First, by signing recurring memoranda of understanding[13] that, by their explicit terms, "modif[ied] the terms and conditions"[14] of the Southern Nevada Labor Agreement by adjusting rate and wage schedules. Each of these memoranda provided for a "one [] year extension to the existing [Southern Nevada Labor Agreement]," the last of which set the agreement's expiration for June 30, 2015.[15] Second, the parties modified the agreement by signing a successor Southern Nevada Labor Agreement.[16] Unlike the memoranda, the successor agreement, which took effect on July 1, 2015, did not merely adjust rate schedules; it presented an entirely new agreement similar in length and terms to the initial one.[17] Containing no language incorporating or referencing the

---

[11] As best I can tell, and despite being capitalized, the term "Employer" is left undefined.

[12] ECF No. 30-14 at 14–16, 46.

[13] The initial agreement that Lyndsey signed contained one of these memoranda of understanding. *See* ECF No. 30-14.

[14] *See, e.g.*, ECF No. 30-20 at 2.

[15] ECF Nos. 30-17 at 2; 30-18 at 3; 30-19 at 2; 30-20 at 2.

[16] ECF No. 30-21.

[17] *Id.*

4

prior agreement, the successor agreement stated that it "constitute[s] the complete agreement between the parties signatory hereto, and any other agreed[-]to revisions and/or amendments not herein included are null and void."[18]  And while the successor agreement formally supplied the same set of contribution, duration, termination, and renewal clauses as the initial agreement, the successor agreement's duration clause extended the agreement through June 30, 2019, before automatic renewal kicked in.[19]  The memoranda and successor agreement were signed exclusively by the Southern Nevada PDCA. and Local 159, and not by Olympus.[20]  Plaintiffs assert that the initial agreement, successor agreement, and memoranda of understanding constitute the Southern Nevada Labor Agreement, operative in relevant part from January 31, 2011, through June 30, 2019.[21]

Though Olympus now argues that it was not bound by the Southern Nevada Labor Agreement,[22] it materially complied with many of the agreement's terms and obligations.  For example, in March 2011, Olympus resolved a grievance letter alleging violations of Article 20, §§ 4, 5, and 7 of the agreement.[23]  In March 2016, Olympus negotiated the resolution of unpaid fringe-benefit claims with Districts 15 and 16 under the terms of both the Southern and Northern Nevada Labor Agreement.[24]  After being sued in November 2016, Olympus complied with the Southern Nevada Labor Agreement's surety-bond requirement.[25]  And, apparently throughout

---

[18] *Id.* at 2.

[19] *Compare* ECF No. 30-14 at 14–16, 46, *with* ECF No. 30-21 at 4, 12–14, 38.

[20] ECF Nos. 30-17–20 (memoranda) and 30-21 (successor agreement); ECF No. 30-21 at 38.

[21] ECF No. 30 at 8.

[22] ECF No. 37.

[23] ECF No. 30-23 at 2.

[24] ECF Nos. 29; 30.

[25] ECF Nos. 30-14; 32; 34.

1  the agreement's duration, Olympus received and complied with multiple District 15 audit
2  letters.[26]

3  **III.    Ending the relationship**

4        In early 2018, Olympus began trying to terminate its relationship with the northern and
5  southern branches of the Union.  Lyndsey testified that she first called District 15's
6  representative, Kirk Konys, in January 2018 to confirm that Olympus had not entered into any
7  labor agreements with the southern branch.[27]  Taking his alleged "no" at face value,[28] Olympus
8  moved on to ending its relationship with the northern branch and sent a letter to District 16's
9  Livermore, California, office on April 11, 2018, seeking to "cancel the Northern Nevada Painters
10 Master Agreement," as well as any other agreements it may have with the "Union [defined as
11 District 16]."[29]  On April 24, 2018, Olympus sent an identical cancellation letter to District 16,
12 this time via overnight delivery.[30]  Lyndsey claims to have spoken with Konys again that month,
13 and that he allegedly confirmed that Olympus had successfully "terminated its relationship" with
14 the Union.[31]

15       A year later, on April 29, 2019, Olympus sent a letter to both the Livermore address and a
16 Henderson, Nevada, address, this time seeking to "cancel any and all collective bargaining
17 agreements between Employer [defined as "Olympus and Associates, Inc."] and the Union

18 ───────────────

19 [26] ECF No. 25.  Though Olympus does not dispute this, the plaintiffs present evidence only that
    District 15 sent the audit letters; I see no record of Olympus's compliance with the audit, beyond
20 the plaintiffs' damages-witness's testimony.

21 [27] ECF No. 39-3 at ¶¶ 22–24.  The plaintiff trusts dispute that this call occurred.  *See* ECF No. 40
    at 15–16 (citing ECF No. 39-13 at 14–15).

22 [28] ECF No. 39-3 at ¶ 24.

   [29] ECF No. 30-37 at 2.

23 [30] ECF No. 30-40 at 2.

   [31] ECF No. 39-3 at ¶¶ 25–26.

[defined as "International Union of Painters and Allied Trades"], including without limitation, the [Southern Nevada Labor Agreement]."[32]  Plaintiffs concede that this final letter terminated Olympus's relationship with both Districts 15 and 16 of the Union.[33]

## IV.    ERISA suit

The parties agree that Olympus did not make contributions to the beneficiary trusts under the Southern Nevada Labor Agreement from July 1, 2018, through June 30, 2019.[34]  The trusts sued Olympus for violations of § 515 of ERISA and breach of contract, and they seek a claim against Olympus's surety bond for the delinquent-contribution amounts.[35]  They also attempt to hold George and Lazarus Tsiopos individually liable for Olympus's alleged breach under the terms of the incorporated trust agreements referenced in the Southern Nevada Labor Agreement.[36]  The parties agree that the contribution amounts are generally calculated by multiplying the number of hours worked by union affiliates by the contribution rate in effect at the time of that work.[37]  The trusts, depending on audits performed by Berry & Co., claim that the unremitted contributions for the relevant period, including interest and liquidated damages, total $211,425.14.[38]  Both sides cross-move for summary judgment on all claims, and Olympus

---

[32] ECF No. 30-41 at 2.

[33] *See* ECF No. 30 at 13 (noting that, by September 2018, Districts 15 and 16 had merged).

[34] *See* ECF Nos. 30-14 (Articles 8-14, 23); 30-21 (Articles 8-13, 22) (setting forth contribution requirements to the plaintiff trusts).

[35] ECF No. 18 (amended complaint).

[36] ECF No. 18 at 12–13.  While Olympus argues that its officers cannot be held individually liable, it does not deny that the trust agreements are incorporated by reference into the labor agreement.

[37] ECF No. 30-36 at ¶ 8.

[38] ECF No. 30-44 at 4.

1  also seeks summary judgment, arguing that the plaintiff trusts cannot prove their damages

2  because they have not established relevant contribution rates.

3  **Discussion**

4  **I.   Standard of review**

5          The principal purpose of the summary-judgment procedure is to isolate and dispose of

6  factually unsupported claims or defenses.[39]  Summary judgment is appropriate when the

7  pleadings and admissible evidence "show that there is no genuine issue as to any material fact

8  and that the movant is entitled to judgment as a matter of law."[40]  The moving party bears the

9  initial responsibility of presenting the basis for its motion and identifying the portions of the

10 record or affidavits that demonstrate the absence of a genuine issue of material fact.[41]  If the

11 moving party satisfies its burden, the burden then shifts to the opposing party to present specific

12 facts that show a genuine issue for trial.[42]

13         Who bears the burden of proof on the factual issue in question is critical.  When the party

14 moving for summary judgment would bear the burden of proof at trial, "it must come forward

15 with evidence [that] would entitle it to a directed verdict if the evidence went uncontroverted at

16 trial."[43]  If the opposing party would have the burden of proof on a dispositive issue at trial, the

17 moving party doesn't have to produce evidence to negate the opponent's claim; it merely has to

18

19  _____

[39] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

20 [40] *See id.* at 322 (citing Fed. R. Civ. P. 56(c)).

21 [41] *Id.* at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

[42] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS*
22 *60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

23 [43] *C.A.R. Transp. Brokerage Co. v. Darden Restaurants, Inc.*, 213 F.3d 474, 480 (9th Cir. 2000)
(quoting *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992)) (citation and quotation marks
omitted).

8

point out the evidence that shows an absence of a genuine material factual issue.[44]  In that case, the movant need only defeat one element of the claim to garner summary judgment because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[45]  When resolving "cross-motions for summary judgment on the same claim," "the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[46]  Under the 2010 amendments to Federal Rule of Civil Procedure 56, litigants need only show that the substance of the proffered evidence will be admissible at trial.[47]

## II.   The propriety of Olympus's cross-motion and motion for summary judgment

As a preliminary matter, the plaintiff trusts argue that Olympus violated this court's April 3, 2020, scheduling order by filing an untimely cross-motion for summary judgment in addition to its timely motion for summary judgment.[48]  The Ninth Circuit grants district courts discretion to manage their calendars and dockets, warning litigants that "[a] scheduling order 'is not a frivolous piece of paper, idly entered, [that] can be cavalierly disregarded by counsel without peril.'"[49]  While I am cognizant of the plaintiff trusts' concerns about Olympus's briefing, I find that the defendants' untimely filing has not caused outsized prejudice because Olympus's alleged

---

[44] *See, e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 885 (1990).

[45] *Celotex*, 477 U.S. at 322.

[46] *Tulalip Tribes of Wash. v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001)).

[47] *Romero v. Nev. Dep't of Corr.*, 673 F. App'x 641, 644 (9th Cir. 2016); *see also* Fed. R. Civ. P. 56 advisory comm. note to 2010 amendment; *Lee v. Offshore Logistical & Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017).

[48] ECF No. 40 at 2–3.

[49] *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir. 1992).

9

1 "cross-motion" does not raise alternate grounds for summary judgment beyond those discussed

2 in the plaintiffs' motion.  So I decline to reject Olympus's filings out of hand.[50]

3 **III.     ERISA, breach-of-contract, and surety-bond claims**

4       Section 515 of ERISA provides:

5         Every employer who is obligated to make contributions to a
        multiemployer plan under the terms of the plan or under the terms

6         of a collectively bargained agreement shall, to the extent not
        inconsistent with law, make such contributions in accordance with

7         the terms and conditions of such plan or agreement.[51]

8 In the Ninth Circuit, ERISA "imposes no independent obligation upon employers; it merely

9 provides a federal cause of action to enforce *pre-existing* obligations created by collective

10 bargaining agreements."[52]  Thus, to prevail on their § 515, breach-of-contract, and surety-bond

11 claims, the plaintiff trusts must show that they are multiemployer trusts, Olympus was obligated

12 by the terms of the Southern Nevada Labor Agreement to make contributions for the relevant

13 period, and Olympus failed to make the required contributions.[53]  The parties do not dispute that

14 plaintiffs are multiemployer trusts or that Olympus failed to make contributions, and instead

15 dispute whether Olympus was obligated to make contributions under the Southern Nevada Labor

16 Agreement from July 1, 2018, through June 30, 2019.

17       Relying on the three sets of documents allegedly forming the Southern Nevada Labor

18 Agreement (the initial and successor agreement, and the memoranda of understanding), the

19

---

20 [50] I also need not and do not rule on Olympus's evidentiary objections to Robert William's
declaration, Rachel Mora's declaration, or Lyndsey Tsiopos's deposition testimony, ECF No. 37

21 at 10 n.6, 24 n.13, 28 n.14, because I do not rely on that evidence in reaching my decision.

22 [51] 29 U.S.C. § 1145.

[52] *Trustees of Screen Actors Guild-Producers Pension and Health Plans v. NYCA, Inc.*, 572 F.3d

23 771, 776 (9th Cir. 2009) (emphasis in original).

[53] *C.f. Nw. Admin'rs, Inc. v. Albertson's Inc.*, 104 F.3d 253, 255–56 (9th Cir. 1996).

plaintiffs claim that (1) Olympus was a signatory to and bound by the initial Southern Nevada

Labor Agreement, which was extended until June 30, 2019, by the successor agreement;

(2) Olympus could not contractually terminate the labor agreement until June 30, 2019; or

alternatively, (3) Olympus failed to properly terminate the agreement under the initial

agreement's evergreen duration clause.  Olympus responds with classic contract defenses,

arguing that Lyndsey Tsiopos, who signed the agreement, lacked the authority to do so and, even

if it had agreed, Olympus properly and timely terminated those agreements with its 2018 letters.

Olympus adds that the plaintiffs are estopped from seeking damages under the Southern Nevada

Labor Agreement because Olympus relied, to its detriment, on Konys's alleged confirmation that

Olympus had terminated its contract with District 15.

### A. Olympus was bound by the initial Southern Nevada Labor Agreement and memoranda of understanding, but not the successor agreement.

At the outset, the plaintiff trusts argue that ERISA broadly precludes Olympus from

employing its defenses. "Generally, a third-party beneficiary's rights are subject to any contract

defense that the promisor could assert against the promisee, if the promisee were suing on the

contract."[54]  However, "traditional contract law does not apply in full force in suits brought

under the LMRA and ERISA to collect delinquent trust[-]fund contributions"[55] because

"millions of workers depend upon the employee benefit trust funds for their retirement

security."[56]  In the 1980s, the Ninth Circuit relied on Supreme Court precedent and interpreted

---

[54] *Carpenters Health and Welfare Trust Fund for Cal. v. Bla-Delco Const., Inc.*, 8 F.3d 1365, 1369 (9th Cir. 1993).

[55] *S. Cal. Retail Clerks Union & Food Emps. Joint Pension Trust Fund v. Bjorklund*, 728 F.2d 1262, 1265 (9th Cir. 1984).

[56] *Sw. Admin'rs, Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir. 1986).

§ 515 quite strictly, holding that "an employer may only raise contract defenses that render the

collective bargaining agreement void rather than voidable."[57]   The Ninth Circuit slightly

tempered this position in *Sheet Metal Workers' International Association, Local 206 of Sheet*

*Metal Workers' International Association, AFL-CIO v. West Coast Sheet Metal Co.*, choosing

instead to be guided by the principle that legal obligations in a labor agreement, and defenses

based on those obligations, must find their source "in contract properly executed and currently

effective."[58]   In *MacKillop v. Lowe's Market, Inc.*, the court synthesized these decisions,

reasoning that ERISA suits require maintaining "a distinction between defenses [that] make an

agreement voidable and those that render it void ab initio."[59]   Thus, defendants may raise

defenses related to agreements that lack "force or legal effect" and "became inoperative

prospectively,"[60] but not defenses that merely render a contract currently voidable, like fraud in

the inducement.[61]

### 1.  *Olympus was bound by the initial agreement and memoranda of understanding.*[62]

Under this Ninth Circuit guidance, I find that ERISA impedes Olympus from raising the

defense that Lyndsey Tsiopos lacked actual or apparent authority to bind it to the initial Southern

---

[57] *Laborers Health and Welfare Trust Fund for N. Cal. v. Fisher Dev., Inc.*, 81 F.3d 168 (table) (9th Cir. 1996) (unpublished) (characterizing the 9th Circuit's holding in *Rozay's Transfer*, 791 F.2d at 770).

[58] *Sheet Metal Workers' Intern. Ass'n, Local 206 of Sheet Metal Workers' Intern. Ass'n, AFL-CIO v. W. Coast Sheet Metal Co.*, 954 F.2d 1506, 1509 (9th Cir. 1992).

[59] *MacKillop v. Lowe's Market, Inc.*, 58 F.3d 1441, 1443 (9th Cir. 1995).

[60] *Sheet Metal Workers'*, 954 F.2d at 1509.

[61] *MacKillop*, 58 F.3d at 1443.

[62] Both parties appear to concede that the binding effect of the memoranda of understanding rises and falls with the enforceability of the initial Southern Nevada Labor Agreement.

Nevada Labor Agreement when she signed the agreement. The Ninth Circuit does not appear to have squarely addressed whether an agency defense is permissible under ERISA but generally, "actions that exceed the scope of the agency are merely voidable, not void, and therefore capable of ratification by the principal."[63] As in *Sheet Metal Workers'* and *MacKillop*, Lyndsey's lack of authority to sign the agreement does not necessarily render it currently ineffective; Olympus could ratify the agreement through its ongoing conduct. This result also accords with the policy justifications undergirding § 515, which Congress designed to protect third-party trusts that "are not in a position to know what is going on between the employer and the union"[64] and who "may well [be] saddle[d]" with "unfunded obligations" should an employer be permitted to simply "point[] to a defect in [contract] formation."[65] Nor does such a position leave Olympus without a remedy at law because Olympus could sue or seek indemnification from the Union, which unlike the plaintiff trusts, could and presumably did assess the scope of Lyndsey's apparent authority to bind the company.

But even were I to entertain Olympus's agency defense and find that Lyndsey lacked actual or apparent authority to bind it, those positions are unavailing because Olympus ratified the initial Southern Nevada Labor Agreement by substantively complying with its terms.[66] As

---

[63] 3 Am. Jur. 2d Agency § 164 (2020); *see also Dicion v. Mann Mortgage, LLC*, 718 F. App'x 476, 478 (9th Cir. 2017) (unpublished) ("A challenge to the validity of an assignment based on the executor's lack of authority would make the assignment voidable, not void."); *Monarch Ins. Co. of Ohio v. Ins. Co. of Ireland Ltd.*, 835 F.2d 32, 36 (2d Cir. 1987) (reasoning, under New York law, that a "contract entered into through an agent for both parties is voidable at the option of either party where the parties had no knowledge of the dual agency").

[64] *Operating Eng'rs Local 324 Health Care Plan v. G&W Constr. Co.*, 783 F.3d 1045, 1053 (6th Cir. 2015).

[65] *Orrand v. Scassa Asphalt, Inc.*, 794 F.3d 556, 563 (6th Cir. 2015); *see also MacKillop*, 58 F.3d at 1444–45.

[66] While "the interpretation of a collective bargaining agreement 'calls into being a new common law—the common law of a particular industry or of a particular plant,'" *Trustees of Screen*

noted in *Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, "an employer may be held" to have "'adopted' the terms and conditions of [a] collective bargaining agreement" by "embarking on a course of conduct evincing an intention to be bound."[67]   Applying this principle in its unpublished disposition of *Sturgis v. Columbia Steel Fabricators, Inc.*, the Ninth Circuit reasoned that an employer could be bound by the unauthorized signature of its agent in an ERISA dispute when it "paid benefits required by the agreements to the [t]rust funds."[68]

Olympus does not dispute or contradict the substantial evidence that the plaintiff trusts provide, effectively conceding that the evidentiary record demonstrates that it intended to be bound by the initial Southern Nevada Labor Agreement.   Not only did Olympus comply with audits requested by District 15, it submitted monthly remittance reports to the trusts, paid contributions at the rates required by the agreement, and requested work from District 15's union employees.[69]   Olympus also explicitly agreed in prior litigation that it was bound by the Southern Nevada Labor Agreement.   In 2016, it signed an employer surety bond (a bond it was exclusively required to retain under the Southern Nevada Labor Agreement and not its northern

---

*Actors Guild-Producers Pension and Health Plans*, 572 F.3d at 778 (quoting *Consol. Rail Corp. v. Ry. Labor Execs. Ass'n*, 491 U.S. 299, 311 (1989)) (internal quotation marks omitted), courts are encouraged to consider state law to the extent it does not conflict with federal ERISA law, *Sturgis v. Columbia Steel Fabricators, Inc.*, 974 F.2d 1343 (table) (9th Cir. 1992).   Nevada, like many other jurisdictions, holds that principals may be bound by an agent's unauthorized acts through consent or acquiescence.   *See Orbit Stations, Inc. v. Curtis*, 678 P.2d 1153, 1154–55 (Nev. 1984).

[67] *Hawaii Carpenters Trust Funds v. Waiola Carpenter Shop, Inc.*, 823 F.2d 289, 295 n.8 (9th Cir. 1987) (citing *Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 763–64 (9th Cir. 1981), and *Vin James Plastering Co.*, 226 NLRB 125, 130 (1976) (reasoning that an employer was bound by a collective-bargaining agreement because it had "engaged in a course of conduct [that] manifested an intention to adopt and be bound by [it]")).

[68] *Sturgis*, 974 F.2d at (Table) (declining to overturn a jury verdict where substantial evidence existed that the employer ratified the agent's acts).

[69] ECF Nos. 30-23, 30-25, 30-26, 40-5, 40-6.

14

counterpart)[70] that stated "Olympus . . . has entered into a collective bargaining agreement with the International Union of Painters & Allied Trades, District Council 15, Local Union 159."[71] And in separate litigation that same year, Olympus acknowledged that it was bound by labor agreements with both Districts 15 and 16.[72]  These undisputed facts are more than sufficient to establish that Olympus ratified its obligations with District 15 and agreed to be bound by the initial Southern Nevada Labor Agreement, signed on its behalf by its office manager.

### 2.   Olympus was not bound by the successor Southern Nevada Labor Agreement.

While Olympus may be bound by the initial agreement, the plaintiff trusts have failed to set forth sufficient evidence that Olympus was bound by the successor Southern Nevada Labor Agreement.  Like any contract, interpretation of a labor agreement begins by examining its plain language, whose clear terms cannot be contradicted by extrinsic evidence.[73]  But "[w]hen a collective bargaining agreement is ambiguous, 'it is well established that the parties' "practice, usage[,] and custom" is of significance in interpreting the agreement.'"[74]

Titled the "July 1, 2015 through June 30, 2019" "Painters & Decorators Master Agreement," the Southern Nevada Labor Agreement contains an integration clause that explicitly states that it "shall constitute the complete agreement between the parties signatory hereto, and

---

[70] *Compare* ECF No. 30-8 *with* ECF Nos. 30-14, 30-21.

[71] ECF No. 30-34.

[72] ECF No. 30-29 at ¶¶ 3–4.

[73] *Pierce Cnty. Hotel Emps. & Rest. Emps. Health Trust v. Elks Lodge, B.P.O.E. No. 1450*, 827 F.2d 1324, 1327 (9th Cir. 1987).

[74] *Trustees of Screen Actors Guild-Producers Pension and Health Plans*, 572 F.3d at 778; *see also Pierce Cnty.*, 827 F.2d at 1327 ("[I]f a term is ambiguous, its interpretation depends on the parties' intent at the time of the contract's execution in light of earlier negotiations, later conduct, related agreements, and industrywide custom.").

1   any other agreed[-]to revision and/or amendments not herein included are null and void."[75]

2   Olympus is missing from the list of "parties signatory hereto," as it is neither mentioned as a

3   party in Article 1, § 1 nor has it signed the agreement.[76]  The plaintiff trusts fail to identify any

4   language in the successor agreement that might defeat the integration clause, or incorporate or

5   refer to the initial agreement.[77]  Instead, the plaintiffs broadly ask that I enforce this successor

6   agreement (and its expiration term of June 30, 2019) because (1) the parties' course of conduct

7   indicates that they intended to be bound by its terms and (2) Olympus admitted it was bound by

8   the agreement in later judicial filings.  But absent an ambiguous term that might permit me to

9   look to that conduct, I must cabin my review to the four corners of the document.  I also do not

10  see evidence that Olympus admitted it was bound by the specific successor agreement, as

11  opposed to the Southern Nevada Labor Agreement more generally.  So I decline to find on

12  summary judgment that Olympus was bound by the successor Southern Nevada Labor

13  Agreement.[78]

14        **B.    Olympus's letters did not terminate the labor agreement.**

15        Because Olympus was bound by the initial Southern Nevada Labor Agreement and

16  memoranda of understanding, but not the successor agreement, I conclude that the earliest

17  Olympus could terminate its relationship with District 15 was June 30, 2015.[79]  Upon that date,

18

19  [75] ECF No. 30-21.

20  [76] *Id.*

21  [77] The absence of incorporating language stands in stark contrast to the memoranda of understanding, each of which "modif[ied] the terms and conditions" of the Southern Nevada Labor Agreement.  *See, e.g.*, ECF No. 30-20 at 2.

22  [78] I also decline to grant Olympus's cross-motion on the same issue, largely because it fails to meaningfully distinguish its arguments between the initial and successor agreements.  *See, e.g.*, ECF No. 37 at 15.

23  [79] ECF No. 30-14 at 46; ECF No. 30-20 at 2.

1  the parties' agreement was subject to the contract's evergreen duration clause, which extended

2  the contract "year to year" unless the agreement was timely terminated prior to "June 30 of any

3  subsequent contract year."[80]  Olympus argues that it satisfied this requirement by mailing two

4  letters in April 2018 to the Union's Livermore, California, address, each of which sought to

5  terminate Olympus's relationship with the Union.[81]  The plaintiff trusts do not dispute that

6  Olympus sent the letters or that the letters were timely, but argue that those letters terminated

7  Olympus's relationship with District 16 under the Northern Nevada Labor Agreement and not

8  with District 15 under the Southern Nevada Labor Agreement.

9       As before, I examine the plain terms of the Southern Nevada Labor Agreement to

10  determine whether Olympus's purported termination was effective.  Under the agreement's

11  duration clause, the agreement could be canceled by "written notice of desire to cancel or

12  terminate the [a]greement [] served by either party upon the other."  Neither party points to any

13  ambiguity in this clause, and instead they dispute whether Olympus's letters were sufficient to

14  satisfy it.  I find that they were not.  To satisfy the duration-clause's terms, the termination letter

15  needed to be served upon a "party" to the agreement.[82]  The parties to the Southern Nevada

16  Labor Agreement were Olympus and the "International Union of Painters and Allied Trades,

17  Local Union # 159, which is affiliated with IUPAT District Council 15, Las Vegas, Nevada."[83]

18  The agreement was signed by Lyndsey, representing Olympus, and John Smirk, representing

---

[80] ECF No. 30-14 at 46.

[81] ECF No. 37 at 17.

[82] ECF No. 30-14 at 46.

[83] *Id.* at 4.

1  "IUPAT District Council 15, Local Union No. 159."[84]  Both of Olympus's substantively

2  identical letters[85] were addressed to IUPAT District Council 16 at an office in Livermore,

3  California.[86]  Expressly stating an intention to "cancel the Northern Nevada Painters Master

4  Agreement ('Master Agreement') between Employer and District Council 16 ('Union')," the

5  letters also sought to free Olympus of "any other agreement or labor relationships between

6  Employer and Union."[87]  There is nothing in the record to indicate that these letters satisfied the

7  labor agreement's requirements because they make no mention of the Southern Nevada Labor

8  Agreement and were not addressed to, sent to, or defined to include District 15.

9          Olympus's argument that a letter sent to the Union's California address constitutes

10  termination of the Southern Nevada Labor Agreement is similarly unavailing.  Not only does

11  such a position conflate the Union's international body with its local chapters—which, contrary

12  to Olympus's assertions otherwise, are legally empowered to sign contracts[88]—but there is

13  nothing in the record to indicate that District 15 was ever organized from or located in

14  Livermore, California, before September 2018.  Perhaps recognizing this reality, Olympus also

15  argues that Local 159 doesn't really exist; asks me to take judicial notice of the Union's website,

16  which as of June 13, 2020, stated that Nevada's Union affiliate could be contacted at the

17

---

18  [84] *Id.* at 46.  Olympus asserts, entirely without support, that the International Union is itself a
party to the agreement.  There is nothing in the contract indicating this.

19  [85] *Compare* ECF No. 30-37 *with* ECF No. 30-40.

20  [86] ECF Nos. 30-37 at 2; 30-40 at 2.

     [87] ECF Nos. 30-37 at 2; 30-40 at 2.

21  [88] ECF No. 40-14; *In re Gen. Teamsters, Warehousemen and Helpers Union, Local 890*, 265
22  F.3d 869, 874–75 (9th Cir. 2001) ("[F]ederal labor law has steadfastly recognized the separation
of the International from its local affiliate . . . .  The two entities are distinct . . . .  The fact that
23  the two entities share many goals and bear responsibilities to each other does not imply that all
their goals are shared, or that the international union owns the local one." (internal citations
omitted)).

Livermore address; and argues that District 15 had "actual notice" of its intent to terminate the agreement.[89]

The plaintiff trusts handily rebut Olympus's footnoted argument regarding Local 159's legal status.[90]  And while I am willing to take judicial notice of the existence of the Union's website,[91] doing so does little to further Olympus's argument because Olympus needs to show that the Livermore address could be used to contact District 15 in 2018 and not the current District 16, which encompasses all of Nevada, in 2020.  With respect to Olympus's "actual notice" claim, not only does it impermissibly seek to introduce extrinsic evidence designed to contradict the plain terms of the agreement's duration clause, but Olympus fails to present admissible evidence that District 15 received actual notice.  Instead, Olympus merely proffers Lyndsey's declaration that District 15's Konys told her that he knew about their termination of the contract.[92]  While this classic hearsay may be admissible to show that Lyndsey believed the contract had been terminated, it cannot be used to prove that Konys knew about the contract's termination.[93]  So I find that Olympus did not properly terminate the Southern Nevada Labor Agreement by sending either its April 11th or April 24th letters.

---

[89] ECF No. 37 at 7 n.2 ("Defendants have been unable to locate any entity or organization by the name Painters Union Local 159," "Local 159," "Local Painters 159," or similar iterations), 19–20, 23–24.

[90] *See* ECF No. 40 at 14 (citing ECF Nos. 40-10–40-12).

[91] Facts properly subject to judicial notice are those that cannot be reasonably disputed and are capable of accurate and ready determination.  Fed R. Evid. 201(b); *United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993).  Neither party denies the accuracy of the Union's website.

[92] ECF No. 37 at 23–24.

[93] Fed. R. Evid. 801(c).

C.      **Questions of fact preclude denial of Olympus's estoppel defense.**

In the alternative, Olympus argues that the plaintiff trusts should be estopped from enforcing the labor agreement because Olympus relied to its detriment on a statement by Konys, who allegedly confirmed that the parties did not have an agreement.[94]  An estoppel defense requires:

> (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury.[95]

As a general matter, an equitable-estoppel defense is available in actions under ERISA.[96]  While modifications of collective-bargaining agreements must generally be in writing, in *Audit Services, Inc. v. Rolfson*, the Ninth Circuit entertained an equitable-estoppel argument leveraged by defendant employers who were arguably misled about their obligation to submit contributions on behalf of nonunion carpenters, despite the parties' underlying agreement requiring it to make such payments.[97]  Though the *Audit Services* court ultimately rejected the argument, it did so not because the defendants' evidence contradicted the unambiguous terms of the agreement, but because the defendants could not show that they were "'ignorant' of their responsibility under

---

[94] ECF No. 37 at 22.  While Olympus claims that this is a promissory-estoppel argument, it is, in fact, equitable estoppel.  Additionally, and to the extent that Olympus seeks to argue that the January 2018 call from Konys terminated the parties' agreement, that position is precluded by the clear terms of the agreement.  *See Audit Servs., Inc. v. Rolfson*, 641 F.2d 757, 762 (9th Cir. 1981) (ruling that oral modifications of a labor agreement are impermissible to alter the terms of a written agreement).

[95] *Bob's Big Boy Family Rests. v. NLRB*, 625 F.2d 850, 854 (9th Cir. 1980) (internal quotation and citation omitted).

[96] *Audit Servs., Inc.*, 641 F.2d at 762.

[97] *Id.*

the agreement."[98]  Other courts have similarly suggested that an equitable-estoppel defense may be asserted based on oral representations of a plan fiduciary.[99]

The parties dispute the facts undergirding Olympus's equitable-estoppel defense. Olympus claims that after sending its letters, Konys asked Lyndsey Tsiopos why the company was leaving the union, confirming in her mind that Olympus had terminated the agreement when it mailed its letters.[100]  And Olympus alleges that it depended on that call, believing its time with the Union had finished.  For their part, the plaintiff trusts cite Konys's deposition testimony, in which he denies any recollection of such a conversation.[101]  Viewing the evidence in the light most favorable to plaintiffs, Konys's testimony could be construed as meaning no such conversation occurred.[102]  This factual dispute precludes me from finding on summary judgment that Olympus's estoppel defense fails as a matter of law.

### D.   George and Lazarus Tsiopos are personally liable for the amount owed.

George and Lazarus Tsiopos argue that they cannot be held personally liable under an agreement that they never saw or signed.[103]  As before, I turn to the plain terms of the agreement because, "when 'clear and specific language in a labor agreement is at issue, federal courts are

---

[98] *Id.*

[99] *See Teamsters & Emps. Welfare Trust v. Gorman Bros. Ready Mix*, 283 F.3d 877, 883 (7th Cir. 2002) (noting that equitable estoppel may be available based on "words or conduct by a responsible official of the plan itself"); *Ill. Conf. of Teamsters and Employers Welfare Fund v. Mrowicki*, 44 F.3d 451, 462–63 (9th Cir. 1994) (assuming that equitable estoppel could be asserted based on statements by an agent of a benefit trust).

[100] ECF No. 37-3 at ¶¶ 22–26.

[101] ECF No. 37-13 at 14–15.

[102] *Smythe v. Safeco Ins. Co. of Am.*, 33 F. App'x 303 (table) (9th Cir. 2002).

[103] ECF No. 37 at 26–27.

uniform in their strict interpretation of such language.'"[104]   Article 10, § 3 of the initial Southern

Nevada Labor Agreement states that the "Plans [defined to include the Health & Welfare,

Dental, and Vision Plans] in effect are hereby made a part hereof and all signatories to this

[a]greement are bound by the terms of said [t]rust [a]greement, which are incorporated herein by

reference as though fully set forth herein."[105]   Incorporation-by-reference clauses have long been

enforced by the Ninth Circuit, which has expressly reasoned that collective-bargaining

agreements may effectively incorporate the terms of other enforceable agreements that bear their

own additional terms.[106]

Here, the parties do not dispute that this incorporation-by-reference clause refers to the

plaintiff trusts' agreements,[107] at least one of which states that "in the event" an obligated

employer "fails to make [its] contributions, the President, the Treasurer, and any other corporate

officer who is responsible for payment of contributions by the corporation to the [t]rust fund

shall be each individually liable for the payment of contributions."[108]   The Ninth Circuit and

other courts that have considered the issue have made it clear: parties are bound by the

agreements they sign or ratify, including written trust agreements incorporated into collective-

bargaining or labor agreements.[109]   Because Olympus does not cite authority to the contrary,

---

[104] *Emp. Painters' Trust v. J&B Finishes*, 77 F.3d 1188, 1191 (9th Cir. 1996) (quoting *Irwin v. Carpenters Health and Welfare Trust Fund*, 745 F.2d 553, 556 (9th Cir. 1984)).

[105] ECF No. 30-14 at 20.

[106] *Waggoner v. Dallaire*, 649 F.2d 1362, 1365 (9th Cir. 1981).

[107] *See* ECF No. 37 at 27.

[108] ECF No. 30-7 at 18.

[109] *Waggoner*, 649 at 1365; *J&B Finishes*, 77 F.3d at 1191; *Emp. Painters' Trust and Health & Welfare Fund v. Seattle Structures, LLC*, No. 3:11-CV-05265, 2012 WL 4511625, at *2 (W.D. Wash. Oct. 2, 2012) (enforcing incorporated agreement against both corporate officers, despite only one officer signing the underlying labor agreement); *Emp. Painters' Trust Health &*

1 point out any ambiguities in the contract language that may preclude its enforcement, argue that

2 George and Lazarus are not proper corporate officers, or proffer a factual dispute that may avert

3 summary judgment, I hold that George and Lazarus are personally liable for any delinquent

4 contributions to the Employee Painters' Trust, Amended and Restated Trust Agreement.[110]

5 **IV.    Damages**

6          In its motion for summary judgment, Olympus initially sought to exclude Berry & Co. as

7 an improperly disclosed expert witness under Federal Rule of Civil Procedure 26.[111]  But

8 Olympus appears to abandon this argument in its reply brief,[112] taking the plaintiff trusts at their

9 word that Berry & Co. are not expert witnesses and instead arguing that the plaintiffs' claims

10 should be dismissed because their damages model is irredeemably flawed.  Though lengthy,

11 Olympus's reply largely presents a single argument: of the fourteen projects for which

12 contributions are owed, eleven occurred out-of-area and three occurred in-area, so each set

13 requires a different fringe-rate calculation under the terms of the Southern Nevada Labor

14 Agreement.[113]  It claims that the plaintiff trusts have failed to identify what this out-of-area rate

15

16

17

18

19

20 _____

*Welfare Fund v. Pac. Nw. Contractors, Inc.*, No. C11-5271, 2011 WL 5119375, at *7 (W.D.
21 Wash. Oct. 27, 2011) (same).

[110] ECF No. 30-7 at 11–19.
22
[111] ECF No. 31.
23
[112] *Compare id. with* ECF No. 41.

[113] ECF No. 41 at 2.

should be and asserts that only an expert could opine as to which rates apply to which work projects.[114]

Despite Olympus's new tack—which has truncated this argument's development[115]—I find that the plaintiff trusts have demonstrated that they are entitled to damages, but have not provided sufficient, undisputed evidence to show, at summary judgment, the amount of damages owed. Though neither party provides controlling law on the issue, it appears that "[w]hen the cause and existence of damages have been established with the requisite certainty, recovery will not be denied because the amount of such damage is difficult of ascertainment."[116] This is certainly true in Nevada, whose Supreme Court has held that "the rule against the recovery of uncertain damages generally is directed against uncertainty as to the existence or cause of

---

[114] *Id.* at 6.

[115] Indeed, all of Olympus's arguments that the plaintiffs' damages model is flawed appear exclusively in the reply brief, depriving the plaintiff trusts of the opportunity to respond.

[116] *Mo-Kan Teamsters Pension Fund v. Creason*, 716 F.2d 772, 778 (10th Cir. 1983); *see also McClaran v. Plastic Indus., Inc.*, 97 F.3d 347, 356 (9th Cir. 1996) (applying Tennessee law and noting that "[t]he rule precluding speculative damages 'serves to preclude recovery, however, only where the fact of damages is uncertain'" because "'[o]nce the existence of damages has been shown, all that an award of damages requires is substantial evidence in the record to permit a factfinder to draw reasonable inferences and make a fair and reasonable assessment of the amount of damages"); *Thoresen v. Roth*, 351 F.2d 573, 576 (7th Cir. 1965) (affirming a grant of partial summary judgment against an insurer, which the trial court found liable for legal expenses it should have incurred to defend its insurer despite the amount of these damages being indeterminate); *Great Am. Ins. Co. of N.Y. v. N. Am. Specialty Ins. Co.*, 542 F. Supp. 2d 1203, 1211 (D. Nev. 2008) ("[T]his lack of evidence does not affect this court's ability to find [that] [d]efendant is liable for the expenses it should have contributed . . . .").

damage rather than as to measure or extent."[117]  Thus, the extent of damages becomes an issue "of evidentiary weight instead of admissibility."[118]

First, I am unpersuaded by Olympus's unsupported assertion that only an expert could determine which rates apply to which projects.[119]  Courts frequently rely on lay witnesses to testify regarding unpaid contribution rates using audited materials.[120]  Second, and more importantly, Olympus concedes that damages exist, and it confirmed that the plaintiff trusts' damages model was accurate for at least three of the fourteen projects.[121]  So while the plaintiffs have not provided undisputed evidence to merit a damages award at summary judgment, given their failure to present a rate applicable to out-of-area projects, Olympus has certainly not shown that the plaintiff trusts could never prove their damages amount.  I thus decline to award summary judgment to either party on this issue.

**Conclusion**

IT IS THEREFORE ORDERED that the plaintiff trusts' motion for summary judgment **[ECF No. 30] is GRANTED IN PART**.  Olympus and Associates, Inc. cross-motion and motion for summary judgment **[ECF Nos. 31, 39] are DENIED**.  The following issues remain to be decided at trial:

- Whether the plaintiffs are estopped from enforcing the Southern Nevada Labor Agreement against Olympus, George Tsiopos, and Lazarus Tsiopos; and

---

[117] *Brown v. Lindsay*, 228 P.2d 1262, 266 (Nev. 1951).

[118] *Houston Expl. Inc. v. Meredith*, 728 P.2d 437, 439 (Nev. 1986).

[119] ECF No. 41 at 6.

[120] *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 573–74 (1985).

[121] ECF No. 41 at 4 ("Thus, of the fourteen projects, only three . . . are within the geographic jurisdiction of the Southern Nevada [Labor] Agreement.").

- The amount of damages owed plaintiffs.

IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge to schedule a MANDATORY SETTLEMENT CONFERENCE.**  The parties' obligation to file their joint pretrial order is STAYED until 10 days after that settlement conference.

_____
U.S. District Judge Jennifer A. Dorsey
February 10, 2021

26